Okay, the next argued case is number 16, 15, 18, Los Angeles Biomedical v. Eli Lilly and Company. So we have an appeal and cross-appeal. Ms. Davison. May it please the Court. The Board's determination that the claims of the 903 patent are obvious should be reversed. The 903 patent claims the first pharmaceutical treatment for the disease of penile fibrosis using a novel method of administering a family of drugs known as PDE5 inhibitors. It is undisputed that at the time of the invention, a person of skill in the art would have expected PDE5 inhibitors to promote, to worsen fibrosis based on the then understanding of the underlying physiology. Given that expectation, a person of skill in the art interested in curing penile fibrosis would not have turned to PDE5 inhibitors as a candidate therapy prior to the invention claimed in the 903 patent. There simply was no reasonable expectation of success in using PDE5 inhibitors to arrest or regress penile fibrosis as the 903 patent claims require. And consequently, it was also entirely unexpected when the inventors of the 903 patent successfully did so. Can I ask you to please turn to one of your arguments and that is the claim language an individual with at least one of a penile tunicle fibrosis and corporal tissue fibrosis and your board found that despite that plain language, it was possible to construe this as someone with just ED symptoms and not actually one who has either of those fibrosis. And you make an argument that the plain language of that limitation demands that somebody have one of these fibrosis. The main argument I understand being made against you is that you waived this argument because you didn't make it in response to the IPR. Can you address whether it's waived or not? Your Honor, it is not waived. We have always maintained that this claim construct, that this claim an individual with at least one of the penile tunicle fibrosis or corporal tissue fibrosis must be construed as an individual actually having penile fibrosis. Now, when the board actually determined that that should be construed as requiring merely an individual that has symptoms that may be associated with penile fibrosis such as ED, our criticism of that construction is that it goes against a meeting of the claims that is very clear from the language of those claims. That is not something that we have waived. We've maintained that construction all along, Your Honor. The board found the 903 claims to be obvious is largely the result of unreasonable claim constructions that altered what the claimed invention is. The board effectively struck three key limitations. It eliminated the requirement of therapeutic efficacy of arresting or regressing penile fibrosis. It changed the target disease from penile fibrosis to erectile dysfunction. It eliminated the continuous long-term regimen that's essential to PDE5 inhibitor efficacy against penile fibrosis. Since those errors permeate the rest of the board's obviousness analysis, I'll turn to each of those claim constructions first. Regarding arrest or regression of at least one of the penile tunicle fibrosis and corporal tissue fibrosis, the board construed that as merely the intended result of giving a PDE5 inhibitor up to 1.5 milligrams per kilogram per day for at least 45 days. Even under the broadest reasonable interpretation standard that applies during IPR proceeding, that was unreasonable. In refusing to give patentable weight to the arresting or regressing element, the board ignored a distinct step which requires therapeutic efficacy. So arresting or regressing, it's not a preamble, it's not a whereby clause, it doesn't duplicate the other claim elements, nor is it necessarily the result of practicing the other claim elements. Because the claims method otherwise specifies only a maximum dosage and a minimum treatment duration, efficacy is not certain. So without that arresting or regressing limitation, the 903 patent claims would not require therapeutic efficacy. As for how this element should be construed, the specification contains ample evidence that the inventors use arrest to mean stop and regress to mean reverse penile fibrosis. Turning back to that limitation that an individual has at least one of a penile tunical fibrosis and corporal tissue fibrosis, the board construed that element to require merely that an individual have symptoms that may be associated with penile fibrosis such as ED. Again, because of the clear language of the claims, the claims require that an individual must actually have penile fibrosis. And moreover, it's undisputed in this case that erectile dysfunction has many different causes. So a man may have erectile dysfunction because he's depressed, as a side effect from other medications, for neurological or hormonal reasons. So is your argument, just so I understand it, that Montorsi and Whitaker at most disclose whatever diagnostic daily or non-daily routine they have, they disclose treating ED in elderly patients or treating ED, but treating ED is not necessarily the same thing as treating someone with one of these fibrosis. That's correct, Your Honor. So an individual with ED, right, having ED does not mean that you have penile fibrosis. Having penile fibrosis does not mean that you have ED. And if you cure ED, that doesn't mean you cure penile fibrosis. And conversely, if you cure penile fibrosis, that doesn't mean that you cure erectile dysfunction. So by focusing on that symptom of erectile dysfunction, the board's construction impermissibly encompasses individuals who have no penile fibrosis whatsoever. And on the flip side, the board's construction also leaves out individuals who have penile fibrosis, but no ED, but who would have benefited from that therapy. Now, properly construed, the limitation requires that an individual have tunical or corporal fibrosis and that the fibrosis be clinically significant. Lily argued below that any degree of fibrosis... Do you mean by clinically? Well, perhaps you're going there. Yes. So Lily had argued below that even an extra molecule of collagen would be sufficient. But the claims clearly require treatment of a medical condition, which ultimately requires that a person of skill in the art could either recognize that someone has penile fibrosis or already has penile fibrosis. As in a medical condition, as in something that has manifested itself with symptoms. Correct, Your Honor. Right. But isn't that where the ED construction comes in? So the problem, Your Honor... That's a typical, at least for this patient group, that's a typical indication of penile fibrosis, right? So, Your Honor, some men with penile fibrosis do have erectile dysfunction. But the problem is that by focusing on simply that symptom of ED, because ED has many other causes other than penile fibrosis, just because a man has ED does not mean that he has penile fibrosis also. And that's the heart of the issue with this construction. Well, just because someone has ED doesn't mean they have a fibrosis, but if someone has a fibrosis, does that mean they have ED? No, not necessarily. So only some men with cunical or corporal fibrosis end up having ED. It's not a 100% correlation. To come back to clinically significant, you mean manifesting itself in symptoms that a patient would go to a doctor to have addressed? Yes, Your Honor. And what symptoms other than ED would that patient have? Peyronie's disease, is that... Yes, so Peyronie's disease, for example, is often accompanied by penile curvature. Right. It may be accompanied by an actually palpable fibrotic plaque. Right. It's often accompanied by pain. So these are all additional symptoms that a person with penile fibrosis might experience, for example. Right, but also it's accompanied frequently, I gather, by ED. Some number of patients with penile fibrosis also have erectile dysfunction. Well, I mean Peyronie's disease. Yes, some men with Peyronie's also have ED, but not all of them. I bet that this really fits with what Judge Bryson was asking. It seems to me that it ought to have been feasible to draft claims which avoided capturing what's already being experienced in the art, but I can't see that these claims exclude, and perhaps this is what was troubling the board as well, exclude what's already known. So, Your Honor, I believe they do exclude what's known once the claim terms are properly construed. So these claims are not to a treatment, or they're not to a method of relieving the symptoms of erectile dysfunction, which is what had been in the prior art previously. What these claims are intended to cover is an actual curative therapy for penile fibrosis, which is distinct from erectile dysfunction. Okay, let's hear from the other side, and we'll come back to this on rebuttal. Could I just ask one quick question? Of course. You had a third issue that you alluded to at the beginning, and I missed it. What was your third issue besides the omitted regressing and arresting and the changed target disease? Also, the board had also eliminated the requirement for a continuous long-term regimen. Right, okay, thanks. Do you want to pursue that? No, that's fine. I just wanted to make sure I understood that. Okay, thank you. Mr. Feldman? Your Honor, thank you. So on behalf of Lilly, Your Honors, I'd like to pick up and we see three key problems with LA Biomed's appeal. I mean, basically they've appealed all the claim constructions, and the way we read the court's findings, the board's findings, nothing changes even under their findings, under their claim constructions. Likewise, their arguments argue alternative information from the record, but don't show error in the board's findings. Don't show that they're unsupportive. Well, why don't you start with the one that I was asking her about and explain why even under their construction, Montt Torsey or Whitaker disclosed using this regimen to treat someone with one of these fibrosis. Absolutely, Your Honor. So what the board found on Appendix 22 is that treatment of ED in elderly patients or patients with atherosclerosis, as suggested by both Montt Torsey and Whitaker, would result in the treatment of patients with the fibrosis. And they have similar findings on Appendix 28, that the daily treatment would result in treatment of ED in which there is underlying corporeal fibrosis. And so the argument from L.A. Biomed… Wait, so treatment of elderly patients with ED would treat fibrosis, but that's not the same thing as a disclosure of it, right? This is an obviousness rejection. We have to look at the references for what they teach. Sure. So how does it teach it? What Montt Torsey teaches is that, and this is on Appendix 5597, ED from aging… So we're not talking about all ED, we're talking about ED from aging, is the result of atherosclerosis-induced capronosal ischemia leading to CVOD. CVOD is one of the claims fibrosis is in Claim 3. And so the class of ED that Montt Torsey is specifically teaching to treat is ED that results from fibrosis. And so it matters not if some ED is not for fibrosis. Montt Torsey's population is ED due to fibrosis, and therefore when you treat a Montt Torsey patient, ED due to fibrosis, you're treating a patient with fibrosis. But it looks as if they've made discoveries about fibrosis, which are much broader and which they're trying to capture in their claim as well. Whether they've made discoveries broader, I would dispute that, but it's irrelevant because if anything within the scope of the claim is obvious, the claim is invalid. And so clearly one of the types of fibrosis they're trying to cover is CVOD. The Montt Torsey elderly patients have CVOD, the fibrotic condition, and Montt Torsey at least renders that condition obvious. And if that condition is obvious, the whole claim is obvious. And likewise, Whitaker's patients are not merely ED patients. They're patients whose ED results from circulatory dysfunction arising from conditions such as diabetes and atherosclerosis. And again, Montt Torsey explains that ED due to conditions such as atherosclerosis is a fibrotic condition. And so the references specifically teach treating patients who have ED due to fibrosis. And therefore, the claim construction argument about whether or not the claim covers people who only have a molecule of extra fibrosis or whether it claims patients who have no fibrosis at all is irrelevant to the findings. The findings were that the patients who are taught and suggested to be treated are fibrotic ED patients. Are they? I mean, is that really what the board held? Because they keep using the word the fibrosis is associated with ED in those patient populations. It doesn't say or make a fact finding as clearly as you just stated, which if you are correct about the science would make this issue moot for me. They don't say that atherosclerosis, or I don't know how to pronounce these words, but they don't say that that is necessarily a fibrosis. They say that corporal fibrosis are associated with ED in this patient. That's kind of like saying a cough is associated with people who have the flu or something like that. That's the way I read it. That's why I'm pausing. You're making very clear statements of science that I don't understand necessarily, and it might just be because I don't understand the science, but the board twice says Montessori teaches is associated with the development of corporal fibrosis, and that seems like very precise language in a scientific area. Associated with is not the same thing as when it teaches this atherosclerosis thing, that that is teaching a fibrosis, and therefore it discloses it. So the board does say multiple times, I think you're reading from appendix page 22, I would also say on appendix page 28, right before the heading claim two, thus the ordinary artisan would have understood that doses up to 1.5 milligrams per kilogram per day, what they find obvious from the references, would be well tolerated, and that the obvious daily treatment would result in treatment of ED in which there is an underlying fibrosis. So they're clearly recognizing that there is underlying fibrosis in some EDs. I mean, that's the problem, isn't it? That the way the board construed an individual with at least one of the two forms of penile fibrosis is as someone who has ED. But that's not really an accurate definition of someone with penile fibrosis, is it? It may be an accurate definition with respect to some people who have ED, but not all. You would agree with that. It's correct with respect to... Well, let's start with, you would agree with that proposition, right? That not all ED patients have fibrosis. Right, and therefore if you define fibrotic patients by saying their people, by saying they are, the entire universe of people that have ED are fibrotic patients, then that would be error, would it not? I don't think anyone made that expression. But isn't that exactly what the board is saying on page eight, when they say that an individual with at least one of the two forms of penile fibrosis requires the individual have symptoms that may be associated with penile fibrosis such as ED, i.e., if you have ED, you've got penile fibrosis. It depends how you read what associated means. If you say that there's a possible correlation or a necessary correlation. If you read it as a possible correlation, that may be mistaken. If you read it as a necessary correlation, which is consistent with the findings that the patients from Montorsy and Whitaker do have ED due to fibrosis, then it all fits together. And regardless of how you read the claim construction, the finding of fact is that even under LA Biomed's construction, that you have to have clinically significant ED. Montorsy's patients have ED, which is clinically significant, due to fibrosis, and Montorsy expressly teaches that. That's not the interpretation of the board. But all patients who have pneumonia have a cough, let's hypothesize. That doesn't mean everybody who has a cough has pneumonia. And if you define people with pneumonia as people with a cough, then that would be wrong. And I think that's a very simple-minded way to say it, but it seems to me that's what the board is saying on page eight. Now, you may be able to explain why that's not so, but that's the way that two-sentence segment of the board's opinion looks to me. If you read that out of context of the rest of the opinion, I can see how you read it that way, Your Honor. But if you read it in context of the opinion, the actual finding, the actual finding is that Montorsy's patients have ED. They're not saying, I mean, excuse me, Montorsy's patients actually have ED due to fibrosis. Whether the claim construction should be a little bit narrower or whether it's the appropriate breadth, depending on how you interpret it, is irrelevant because the patients have ED due to fibrosis. They have a clinically significant symptom, ED. They have it due to fibrosis. It's a clear teaching of Montorsy. It's not speculation. It's been 5597 that ED results from aging. ED from aging, that's the population he wants to treat, is the result of atherosclerosis-induced cavernosal ischemia leading to cavernosal fibrosis and venal occlusive dysfunction. So it's clear that the population, regardless of whether the claim construction is perfect or not, the fact findings are that the patients actually have symptomatic fibrosis causing ED. Which fact finding? I assume it's on 22. Which is the fact finding where the board expressly holds, as clearly as you keep stating it, that Montorsy discloses treating patients with fibrosis? So I was reading, Your Honor, just now from Montorsy itself. No, the board fact finding is what I'm interested in. I understand. Because what Montorsy says, like at 5596, is animal studies have identified an association between venal occlusive dysfunction of the corporal cavernosa and corporal fibrosis. Animal studies. I mean, that's why you're making these very strong assertions of scientific fact. So the segment of the board's opinion that you're focusing on, I take it is lines 10 through 15 or so from page 22, right? That's the conclusion they get to. Their support earlier in the opinion as well. This is the ultimate finding? Yes, Your Honor. All right. And so, Judge Moore, starting on page 14. I understand. That's fine. Oh, if you want to go to a different page, I'm sorry. Yeah, on page 14, in the middle of the page under the quote, the board is recognizing under the quote, Montorsy teaches, therefore, as ED from aging appears to be a slowly progressive disorder, it would appear wise for the patient to seek medical intervention early so as to minimize the development of venal occlusive dysfunction. That venal occlusive dysfunction is the CVOD claim three fibrosis. And so there's that teaching there. But you want to minimize the development of a fibrosis. That doesn't mean that these people are necessarily having one. You want to minimize the development of one, not you want to treat one that already exists. No, I appreciate that, Your Honor. And then on page 20, the board is recognizing that the argument on line three, Petitioner notes that Montorsy teaches that atherosclerosis affects the venal occlusive mechanism of the corporal cavernoso, teaching the daily use of a PD-5 inhibitor. I don't think that's at all relevant to this question, but that's okay. I don't think it's relevant to this question, but I think it gives you a good jumping off point. You only have three minutes left, and I'd really like you to turn to the daily dosing issue, which is the thing that she really mentioned at the outset, didn't get much of a chance to talk about. But I'd like to ask you to show me where in either Montorsy or Whitaker it discloses the daily dosing requirement. Sure. Or do you dispute that there is a daily dosing requirement? No, they teach daily dosing. But you don't dispute that the patent claims require daily dosing? The PTAB found that 45 days taken daily would be within the scope of the claims. Yes. No, I do not dispute that. Okay, just wanted to make sure. So in terms of where Whitaker teaches 45 days... Whitaker teaches daily administration. There's no doubt about that. But I thought it said as long as the patient suffers from ED. Right. Without a particularized timeframe. Right, and that's going to come up again in the next argument. We're just going to focus, I think, on that issue. But on page 21 of the opinion, appendix page 21, the board recognizes that Whitaker expressly teaches once daily dosing, teaching that the treatment should last as long as the rectile dysfunction continues, and expressly teaches time periods of 8 to 12 weeks, and that better responsiveness comes with more time. And what we know from Whitaker is that... What we know from the experts in this case, Your Honor... Am I misunderstanding? I thought the 8 to 12 weeks were in Montorsi. Is that in Whitaker? They both have... That's example 6 of Whitaker. Whitaker example 6 is 8 to 12 weeks. There's a separate Montorsi disclosure of similar length time periods. And so what Whitaker is teaching is Whitaker is teaching to take it as long as the condition persists, and that is on page 5609. And what both experts in the case said is there's only one understanding. A person with a preliminary skill would only understand as long as a patient suffers from ED to have one meaning, that it would be a time period of at least months. And so, of course, it doesn't literally say 45 days, but ED was understood to be a long-term, if not a lifetime condition, absent some change to your body. And, therefore, if you treat it as long as a patient suffers from erectile dysfunction, and you're treating it essentially indefinitely, but what both experts agreed is that it would be a time period of at least months. At least months is certainly not less than 45 days. And that's Bevilacqua and Goldstein that you're relying on? Correct, Your Honor. So if I can, Your Honor... If you could just briefly address the arrest-regress issue that Ms. Davison started off with. So under the broadest reasonable construction, there's no error in finding that arrest or regress is an inherent step of the process, that it results from the step. There's only one thing you do. You only give a pill, and the arrest or regress happens. Whether arrest being stop or slow or whatever it means, it's still properly construed under the broadest reasonable interpretation to be the result of the one and only affirmative step in the claim is give a pill. And, therefore, this is consistent with L.A. Biomed's infringement allegations in the related district court case that are in the record here, too, that by instructing users to take Cialis, which is the same Tadalafil drug as in Whitaker and Horst, that taking that daily will result in the arresting and regressing of erectile dysfunction. What if the patent drafter, at least, let's assume, had the view that it only worked a third of the time and, therefore, wanted to limit the scope of the claim just to those cases in which it was actually effective? Because the only teaching in the patent is that if you do it, this result happens. You have to take that as admission and read it that way. And it's reinforced by the district court case where they said taking it will result in the arresting and regressing. And it doesn't matter exactly what arresting and regressing means to find that it's the inherent result of the method that's taught, which is only taught as to be a one-step method. Can I ask one more question? Please, of course. I want to come back to Whitaker for a second, only because the example six, I remember why now I was having some concern about it. And it's the question of whether it teaches daily dosage, given that example six includes a table. I don't actually, for some reason, have Whitaker here with me, which is a mistake on my part. But my recollection is that it's a chart that says something like less than 30 percent, 30 to 70 percent, or 70 percent or more, and that how is it that that teaches daily when it's reporting results clearly of patient compliance at less than 100 percent? And, in fact, the chart doesn't actually say 100 percent anywhere on it. So there's no evidence that any of the participants in that eight- or 12-week study actually were, in fact, administering the dose daily 100 percent of the time. Sure. But we're not talking about inherency of example six. We're talking about what does Whitaker suggest? It suggests treating patients daily as long as the condition persists. No, but the claims require continuous treatment for 45 straight days. I understand. And there's no doubt that some of these, like the 12- and the six-week study in Montorsi, and then, again, I'm having concerns about the eight- or 12-week study in Whitaker, because they're clearly not daily, like they're five days a week on weekdays, but not weekends, or something like that. And the claims require daily, continuous, everyday administration, and that these references teach long-term administration, but not necessarily daily. Okay. The preferred treatment in Whitaker on page seven, which is appendix page 5609, the preferred treatment is daily as long as the patient suffers. And so there's a preferred treatment of treating your patient daily. That's what Whitaker prefers. Example six seems to be a building block of how they got to that. They found that if you took it 30 percent of every day, you got some improvement. If you took it 60 percent of every day, you got more improvement. If you take it 70 or more percent of the day, you get more improvement. And that led to the conclusion that we should instruct people to take it every day. And so whether example six need not be a disclosure that people took it every day, because that would only be relevant if it was a question of inherent anticipation. Here, the question is, what does the reference suggest doing? The reference suggests taking it daily for an extended period of time. How do we know it's extended? We know it's extended because it says as long as the patient suffers, which is at least months, both experts agree. And we know that in context that they were doing eight- and 12-week clinical trials, so they're not thinking very short-term. I'm bringing you my copy of Whitaker. I left it. Just briefly, where- Thank you. No, no, go ahead. Please, go ahead. Briefly, where in Montorsy is there a reference to eight- to 12-weeks? Is it in the discussion of one of the studies? It's earlier in the background. And the Whitaker-Montorsy studies are not daily studies. They're on-demand studies. And the way the board seems to have relied on that is that Montorsy is also thinking long-term. But the Montorsy studies- But the Montorsy studies say no- I think it's on 5598, and it's 12 weeks or six months. It's not eight weeks. I misspoke when I said eight weeks. I think I was confusing them maybe. I don't know. But in any event, it says not more than once daily, right? Isn't that what it says on 5598? In Montorsy, I think that's correct. Yeah, not more than once daily. Right. And so the Montorsy study is not a study- Doesn't that expressly suggest to you you can take it certainly less than daily? That study in Montorsy gives you some time frame for how long, but it's on page 5597 where they're taking administrative nightly. That's the suggestion for doing it daily, i.e. nightly. But that isn't accompanied by a duration factor, right? It seems to be indefinite, Your Honor. Okay. Well- Indefinitely open, not indefinitely not lacking meaning- As long as the patient is symptomatic. Right, and what Dr. Goldstein says, if you have ED due to aging, it's the rest of your life. Okay. I think with a lot of these issues we're getting to are relevant to the cross-appeal as well. So I think that- We can take it back up there. By the time we finish, we'll get to probe everything. So still on your appeal, let's continue with the rebuttal. Thank you, Your Honor. Turning to Montorsy, so the central statement in Montorsy that Lilly has relied on is the one on page 5597 saying these data have opened the door to further study investigating the possible dosage of sildenafil to be administered daily at bedtime to prevent or treat ED in the elderly patient. And that's referring to a one-night sildenafil study. But I think what's critical to understand about that statement is it's an invitation to investigate, which is not a proper basis for an obviousness determination. And as for the other study to which the board referred in its decision in Montorsy, that is, as opposing counsel admitted, an as-needed study. And that instruction to take not more than once daily simply meant, if you have an opportunity to have sexual intercourse more than once daily, you are not allowed to take a second pill. But otherwise, the instruction was simply to take sildenafil an hour before sexual activity. Well, but Whitaker does have, does it not, the reference, the definition of day and daily, and then on page 7 of Whitaker talks about preferably daily. In that reference it's referring to three or more days, but that is a, it seems to me that that nails down the daily part of the question, does it not? I think, Your Honor, that daily is an interval, right? It's an instruction. For example, in Whitaker, Whitaker describes daily as about once per 24 hours. And that's a pretty normal definition of daily. But what it doesn't give you is how many times and for how long, right? So daily is not a duration. Well, it says more preferably one time per 24 hours. So it gives you, it doesn't give you duration, but it does tell you once a day, it seems to me. Right. But I think if you look further in Whitaker, it becomes evident why daily doesn't necessarily correspond to a duration, for example, of at least 45 days, right? So Whitaker does say, effectively, that treatment may be intermittent, right? That you can skip every fourth dose. If you look at example six, it's clear that the study subjects in that example are not taking it consistently every single day. Right. So daily is not a teaching of how many times and for how long. It's simply the interval. And that's crucial because Whitaker also indicates that you can have intermittent daily treatment. And regarding months, if not longer, Your Honor, Dr. Bivalakwa's testimony that daily, as long as the patient may suffer from erectile dysfunction, Dr. Bivalakwa's testimony about months, if not longer, is simply not relevant to that. What his testimony concerned was non-pharmaceutical intervention, like diet, like exercise, like quitting smoking, and how long that might take to resolve ED symptoms. That doesn't cast any light on the duration in Whitaker of that treatment. If there are no other questions, I'll stop there. Well, I think we're okay on your appeal. So that case is submitted.